IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 10-00027-01-CR-W-ODS |
| | ) | |
| MICHAEL K. SCOTT, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER AND OPINION OVERRULING DEFENDANT'S OBJECTIONS, ADOPTING MAGISTRATE JUDGE'S REPORTS AND RECOMMENDATIONS, AND DENYING DEFENDANT'S MOTIONS TO DISMISS**

Defendant has been indicted on three counts of bank robbery, three counts of using a firearm during a crime of violence (the aforementioned bank robberies), and one count of being a felon in possession of a firearm. He filed three motions to suppress, seeking to suppress (1) evidence found in his car, (2) statements he made to law enforcement, and (3) a pretrial identification by a witness to one of the robberies. The motions were referred to the Honorable Robert E. Larsen, Chief Magistrate Judge for this District, for recommended dispositions. Judge Larsen conducted three separate hearings, one for each of Defendant's motions. He also issued three separate Reports, the combined effect of which recommended that all three of Defendant's motions be denied. Defendant filed objections; the Court has reviewed *de novo* the parties' arguments, the Transcripts of the three hearings, and all documentary evidence introduced during those hearings. The Court now overrules Defendant's objections, adopts Judge Larsen's Reports and Recommendations, and denies Defendant's motions to suppress.

I. FACTUAL FINDINGS

The Court agrees with the factual findings recommended by Judge Larsen's reports. Nonetheless, a brief recitation is necessary to enable the Court to address

Defendant's arguments. The Court has not addressed all of the facts Defendant complains were not addressed in the Reports. This is because Defendant emphasizes a great many facts that are simply not relevant.

The first bank robbery was on September 2, 2008, and involved a Bank Midwest branch in Platte County, Missouri. Witnesses reported, and tapes from the bank's video cameras confirmed, that there were three gunmen wearing masks covering their faces, with eye holes cut out of the masks. During the investigation, law enforcement learned that shortly after the robbery a lime green Jaguar had sped out of a carwash located approximately a quarter mile from the bank. A stolen Toyota Camry had been abandoned in the carwash's parking lot; it was running at the time it was discovered. Law enforcement suspected that the Camry had been used by the robbers and driven to the car wash, where it was abandoned while the robbers switched to the Jaguar that had been parked in the car wash.

The witness who observed the Jaguar leaving the car wash supplied the license plate number. The car was registered to Defendant, and further investigation revealed that Defendant was receiving mail at an apartment located at 910 Pennsylvania in Kansas City, Missouri. Later that day law enforcement officers observed the apartment and eventually saw a lime green Jaguar with the reported license plate pull into the parking lot. The car was driven by Michon Starnes, who was accompanied by her three minor grandchildren. Ms. Starnes and her grandchildren went into the apartment. FBI Special Agent Leena Ramana and two detectives from the Kansas City Police Department knocked on the door to Defendant's apartment; they did not have their guns drawn. Approximately four additional law enforcement officers waited down the hallway; their guns were drawn.

Ms. Starnes answered the door. Agent Ramana testified that Ms. Starnes could not have seen the officers who stood down the hallway with their guns drawn, while Ms. Starnes testified she saw ten to fifteen law enforcement officers, all with their guns drawn. The Court does not credit Ms. Starnes' testimony on this point: there were not ten to fifteen law enforcement officers, so she could not have seen ten to fifteen law enforcement officers. It is true (as will be discussed shortly) that she eventually saw law

enforcement officers with their guns drawn – but this did not occur when she initially answered Agent Ramana's knock on the door, and they were present only for the time it took to complete a search of the apartment.

Agent Ramana and the two detectives identified themselves, indicated they wanted to talk to her about the Jaguar, and asked if anyone else was in the apartment. Ms. Starnes said only she and her grandchildren were present, and upon request granted permission for law enforcement to search the premises for other people. Three or four officers entered, with their guns drawn, and conducted a sweep of the apartment. After confirming there were no other occupants, the officers holstered their weapons and returned to the hallway, leaving Agent Ramana and one or both detectives to talk with Ms. Starnes.

Ms. Starnes reported that she was in an "on again, off again" relationship with Defendant, that the Jaguar belonged to him and she was not the owner, but she was the usual driver because Defendant's license was suspended and she had the only set of keys to the car. Ms. Starnes also testified that Defendant had the car that morning, but he brought it to her place of employment so she could use it because it was raining. Agent Ramana asked Ms. Starnes if she would allow law enforcement to search the car, and Ms. Starnes agreed. Ms. Starnes executed a Consent to Search form and provided the keys to the car. Ms. Starnes testified that she did not feel coerced or threatened into providing consent. She also testified that she was the usual driver of the car, and there were no restrictions on her use or access.

A search of the Jaguar's interior revealed a stocking cap with eye holes cut out, a tan floppy hat, four FAC filters, and bolt cutters. The FBI then seized the car so it could be searched more thoroughly; after it was processed, the car was stored in the FBI's garage.

Defendant contacted Agent Ramana in an effort to get the Jaguar back, and they made arrangements for Defendant to come to the FBI building on November 20, 2008. Upon arrival, he was buzzed into the parking lot by a security guard; this is typical for all visitors entering the parking lot. He went through a metal detector upon entering the building; again, this is standard procedure for all visitors to the building. Defendant

waited in the lobby until he was met by Agent Ramana and Agent Arch Gothard, who told him there were difficulties starting the car.

While waiting for a technician to jump the dead battery, Defendant was not placed under arrest, placed in handcuffs, or moved from the lobby. The agents were armed, but their weapons were not drawn. The lobby was open for normal business, with visitors entering and leaving, and Defendant was free to leave the FBI building. During this period of time, Agents Ramana and Gothard told Defendant they had seized the Jaguar as part of a bank robbery investigation and asked where his car was on September 2. Defendant said he did not want to answer the question; he also declined to provide a DNA sample and related that he had consulted a couple of attorneys. Defendant was told he did not have to answer questions if he did not want to. However, while waiting for the technician, Defendant initiated conversations with Agents Ramana and Gothard.

The technician was unable to get the Jaguar started, so Defendant left the FBI building while the technician kept trying. The efforts to start the car were unsuccessful, so the next day Agent Ramana contacted Defendant and made arrangements to tow the car to Defendant's apartment. This was done on November 21. The parking lot was open to the public, and when the car was delivered Defendant was not placed under arrest. Defendant was asked to sign a release of property form and was advised that certain items – notably, a ski hat or mask with the eye holes cut out – had been taken from the car. Defendant then made statements about the hat. In addition, Agent Ramana noticed Defendant was wearing a hat that had the word "Hawaii" on it and asked if Defendant had been to Hawaii; Defendant said he had been to Hawaii approximately one year prior.

On June 19, 2009, the Valley View Bank in Kansas City, Missouri, was robbed. Sandra Herdler is a paralegal at the law firm of Krigel & Krigel; the law firm's offices are in the Valley View Bank building. Ms. Herdler and a co-worker (Candace Livingston) were returning from Costco, where they had been purchasing food for a lunch the firm was hosting. They saw a white van parked in front of the building and planned to park in front of it so they could unload their purchases, but as they started to do so Ms.

4

Livingston saw the bank was being robbed. Ms. Herdler drove her vehicle to the back parking lot, called 911 on her cellphone, and walked across the parking lot to the sidewalk at the side of the building. While observing the white van and attempting to obtain its license plate number for the 911 operator, Ms. Herdler saw the van come around the corner of the bank toward her. From twelve to fifteen feet away, she saw two men in the front seat of the van with their masks off. She testified she was approximately eye-level with the two men, that it was a sunny day, and she had a clear view of their faces. As the van drove past, Ms. Herdler relayed the license plate number to the 911 operator.

Ms. Herdler discussed the incident with law enforcement on two occasions: once on the day of the robbery and again approximately five months later. On the first occasion she spoke with FBI Special Agent Benjamin Kinsey, and told him the passenger was in his late twenties, thin, with light skin. The driver also appeared to be in his late twenties, had a scruffy beard, a moustache, and appeared shorter and stockier than the passenger. Both men were African-American. On November 29, Ms. Herdlerler spoke with Agent Ramana and Detective Jospeh Daneff. By this time, law enforcement believed Defendant was involved in the robbery, so prior to the interview Detective Daneff prepared a photographic array to show Ms. Herdler. He did this by entering Defendant's identifying information in computer that is designed to generate a lineup of pictures of people sharing those identifiers. In doing so, Detective Daneff sought (and obtained) pictures of people who, like Defendant, are in their fifties. This was done because, while Ms. Herdler indicated the individuals she saw were in their twenties, Ms. Herdler confessed she was not good at judging people's ages and in Detective Daneff's experience such estimations were often unreliable. In addition, and most importantly, the objective was to determine whether Defendant was one of the people Ms. Herdler saw: given that Defendant was in his fifties, it was necessary to make sure the other pictures in the lineup were of people who appeared to be of the same age. If Detective Daneff had surrounded Defendant's picture with pictures of people who were obviously much younger, the lineup would have been susceptible to a challenge for being too suggestive. Another lineup was prepared containing co-

defendant Claude White. Ms. Herdler identified White as the passenger in the front of the van and Defendant as the driver of the van.

The last robbery occurred on January 27, 2010, and involved the Commerce Bank in Parkville, Missouri. Commerce Bank utilizes an Electronic Tracking System, which allows an item placed in the stolen money to emit a signal that can be picked up by law enforcement. Sergeant Lawrence White of the Kansas City Police Department was on patrol when the dispatcher reported the robbery, and his radio picked up the signal from the tracking system. The signal led him to a vehicle in Kansas City, Kansas, which he began to follow. The pursued vehicle accelerated; Sergeant White followed until the vehicle crashed into a terrace in front of a house. Sergeant White observed Defendant one or two steps in front of the driver's door (which was open), running away. He identified himself as a police officer and ordered Defendant to freeze. Defendant complied, at the time saying that he did not have a gun (even though he had not been asked whether he did). Defendant was handcuffed and placed in Sergeant White's patrol car, then transported to FBI headquarters. Agent Ramana and Detective Daneff met with Defendant there. Defendant was in handcuffs; before he was read his Miranda rights, he was asked biographical information. During these questions – but not in response to a question asking for this information – Defendant volunteered that "he was just walking in the area when the police almost hit him and arrested him." Defendant was then read his Miranda rights, and he stated he did not want to talk without an attorney present. He was then informed that he would be transported back to Missouri and turned over to the Marshals, and he would have an initial appearance and a detention hearing. Defendant asked if he would be detained, and he was advised that this was a possibility given that the underlying charge involved bank robbery. Defendant then asked questions about the robberies, some of which implied a certain degree of knowledge about them.

## II. LEGAL CONCLUSIONS

### A. Search of the Car

Defendant contends the search of the Jaguar violated his Fourth Amendment rights. The Fourth Amendment's warrant requirement is not triggered if law enforcement has valid consent to search. E.g., United States v. Amratiel, 622 F.3d 914, 915 (8th Cir. 2010), cert. denied, 131 S. Ct. 1544 (2011). A third-party may give valid consent if they have common authority over the item to be searched, or if they have a sufficient relationship to the item. United States v. Munoz, 590 F.3d 916, 922 (8th Cir. 2010). Common authority does not require an ownership interest and does not depend on the dictates of property law; instead, it focuses on whether the third-party has joint access or control over the property. United States v. Nichols, 574 F.3d 633, 636 (8th Cir. 2009).

Even if common authority is lacking, the results of the search are not suppressed if law enforcement officers had reason to be believe common authority existed. This occurs when officers "reasonably rely on the consent of a third party who demonstrates apparent authority to authorize the search, even if the third party lacks common authority." Id. Apparent authority exists when a reasonably cautious person would believe the consenting party had authority. Id.; see also United States v. Almeida-Perez, 549 F.3d 1162, 1170-72 (8th Cir. 2008).

Ms. Starnes had common authority over the Jaguar. Even if she did not, the results of the search should not be suppressed because the law enforcement officers had reason to believe common authority existed. Ms. Starnes was driving the Jaguar and had the keys. She was in the apartment where the registered owner lived. She asserted she was the principal driver and there were no restrictions on her use. The Court concludes she had common authority over the Jaguar and, even if she did not, the officers' conclusion that she had apparent authority was reasonable.

Defendant points to Ms. Starnes' statement that she was in an "on again, off again" relationship with Defendant. Clearly, however, at the time of the search the

7

relationship was "on" because she had the keys and was in the apartment where Defendant received his mail.  Defendant also characterizes the scope of Ms. Starnes' authority as limited, suggesting she was only allowed to have the car to drive home that day because it happened to be raining, and did not have the authority to allow a search.  In context, however, it appears that Ms. Starnes was explaining that Defendant had the car that morning and brought the keys to her at work because it was raining.  The fact remains that Ms. Starnes described her use of and access to the car in much broader terms than Defendant depicts.

Defendant also argues Ms. Starnes' consent was involuntary, based primarily[1] on the number of officers present and the fact that they had their guns drawn.  However, the Court does not find that there were ten to fifteen officers present.  While guns were drawn while the apartment was searched (with Ms. Starnes' consent) they were not drawn before or after.  In particular, no guns were drawn when Ms. Starnes was discussing the Jaguar.  While Ms. Starnes testified she consented to the search because she wanted the law enforcement officers to leave, there is nothing to suggest the officers indicated they would not leave if she refused to consent.  Ultiamtely, the factual circumstances – including Ms. Starnes' testimony – persuades the Court that the act of searching the apartment to insure that Defendant (or others) were not present did not have a coercive effect on Ms. Starnes.

### B.  Defendant's Statements

Defendant contends his statements were procured through violations of his Fifth and Sixth Amendment rights.  The Sixth Amendment issue is easily addressed: the Sixth Amendment right to counsel does not arise until adversarial proceedings have commenced, and all of the statements at issue were made before Defendant was indicted.  The fact that he consulted with attorneys does not give rise to Sixth

---

[1] Defendant posits other facts that the Court deems as irrelevant to the inquiry even if they are true.

Amendment protections; the right simply does not attach until prosecution – not investigation – commences. Therefore, the Sixth Amendment is not implicated. E.g., United States v. Morriss, 531 F.3d 591, 593 (8th Cir. 2008).

A person's Fifth Amendment right to counsel arises if he is in custody. If a person is not in custody, the Fifth Amendment cannot be violated. E.g., United States v. Muhlenbruch, 634 F.3d 987, 997 (8th Cir. 2011). A statement can also be suppressed if it is involuntary, regardless of whether the defendant was in custody; that is, a statement may be suppressed if it is the product of threats, violence, or promises sufficient ot overbear the defendant's will. Id. at 997-98.

### 1. Statements at the FBI Building

Defendant was not in custody when he was in the FBI building. In determining whether a person is in custody, the Court considers (1) whether the defendant was informed that he did not have to answer questions or that he was free to leave, (2) whether the defendant's freedom of movement was restrained, (3) whether the contact was initiated by the defendant or law enforcement, (4) whether strong-arm tactics or deceptions were employed, (5) whether the atmosphere was dominated by law enforcement, and (6) whether the defendant was placed under arrest. United States v. Lowen, 647 F.3d 863, 867 & n.3 (8th Cir. 2011). Defendant's freedom of movement was not restrained, he initiated the contact in an effort to retrieve his car, no strong-arm tactics or deceptions were employed, he was not placed under arrest, and he was told he did not have to answer any questions. The fact that he had to be "buzzed in" and had to walk through a metal detector does not mean he was in custody, particularly when he was in the lobby of a building from which he could have exited at his leisure. The fact that the building housed the FBI, and the FBI agents were armed, does not outweigh the other factors.

For similar reasons, the Court concludes the statements were voluntary. Considering the totality of the circumstances, nothing that occurred during the encounter at the FBI building exerted pressure on Defendant such that his will was

overborne.  See United States v. Hambrick, 630 F.3d 742, 749 (8th Cir.), cert. denied, 131 S. Ct. 2919 (2011).

### 2.  Statements in the Apartment Parking Lot

Defendant was not in custody when he was in his apartment's parking lot.  He was not under arrest, he was not in handcuffs, he was in a public place, and he was free to leave.  The encounter was arranged due to his desire to recover his car.  Only two law enforcement officers were present; while they were armed, their weapons were not drawn.  Inasmuch as Defendant was not in custody, there was no requirement that Defendant be read his Miranda rights.  Additionally, the statements were voluntary because nothing said or done by the law enforcement officers overcame Defendant's will.

### 3. Statements Before and Following Defendant's Arrest

The Court accepts that Defendant was in custody when Sergeant White ordered him to freeze.  However, Defendant's statement that he did not have a gun was not made in response to any questioning.  Thus, even though Sergeant White had not yet advised Defendant of his Miranda rights, Defendant's volunteered statement need not be suppressed.  E.g., United States v. Lockett, 393 F.3d 834, 837 (8th Cir. 2005), cert. denied, 546 U.S. 1198 (2006).

After being transported to FBI headquarters Agent Ramana obtained biographical information.  Standard booking questions do not require Miranda warnings. E.g., United States v. Reyes, 908 F.2d 281, 292-93 (8th Cir. 1990), cert. denied, 499 U.S. 908 (1991).  While being asked these questions Defendant volunteered information about the reason he was in the vicinity of the crashed car; these statements were unsolicited and as explained earlier their use will not violate Defendant's Miranda rights.

Upon being advised of his Miranda rights, Defendant indicated he did not want to speak without an attorney being present.  Agent Ramana and Detective Daneff then

explained to Defendant the next steps in the process: transport to Missouri, filing of charges, an initial appearance and a detention hearing. Defendant contends his subsequent statements should be suppressed because these statements were the functional equivalent of interrogation. The Court disagrees. "Interrogation occurs when a law enforcement officer engages in 'either express questioning or its functional equivalent,' which includes 'any words or actions on the part of the police (other than those normally attendant to arrest and custody" that the police should know are reasonably likely to elicit an incriminating response from the suspect.'" United States v. Hernandez-Mendoza, 600 F.3d 971, 976-77 (8th Cir.), cert. denied, 131 S. Ct. 362 (2010) (quoting Rhode Island v. Innis, 446 U.S. 291, 300-01 (1980)). Telling a suspect the ensuing steps in the criminal process is not reasonably likely to elicit an incriminating response, so it was not the functional equivalent of express questioning. Cf. United v. Hull, 419 F.3d 762, 767 (8th Cir. 2005), cert. denied, 547 U.S. 1140 (2006); United States v. Wipf, 397 F.3d 677, 685 (8th Cir.), cert. denied, 546 U.S. 835 (2005). Similarly, the statements were not of the sort that would overpower the will of a person in custody and cause them to make involuntary statements.

### C. The Identification

Identification evidence is subject to a two-step analysis. First, the procedures are to be examined to determine if they were impermissibly suggestive. If they are not, the identification is not suppressed; if they are impermissibly suggestive, the second step of the analysis requires the Court to consider whether the suggestive procedures created a substantial likelihood of misidentification. E.g., United States v. Williams, 340 F.3d 563, 567 (8th Cir. 2003); see also United States v. Pickar, 616 F.3d 821, 827 (8th Cir. 2010).

Defendant concedes all six pictures depict African-American men of similar age and weight. He argues the photo array was impermissibly suggestive because three of the subjects "are extremely dark skinned," one of the photos shows a person without a moustache, and "only one other individual besides defendant can objectively be said to

11

have a round face . . ." The Court disagrees. The men share similar characteristics and all (except for the first person's lack of a moustache) generally fit Ms. Herdler's description. It goes without saying that people are not identical, and it is impossible for every person in an array to have precisely the same-shaped face and skin coloring. Some of the men have "rounder" faces, and others have "less round" faces. Some have skin pigmentation that is lighter, some have skin pigmentation that is darker. In short, there are differences, but in the Court's judgement the differences are of the type and degree that would ordinarily be expected when assembling a roster of six people intended to look similar. The differences are not significant and the array as a whole does not suggest a particular person should be selected by the witness.[2]

### III. CONCLUSION

For these reasons, the objections to Judge Larsen's Reports are overruled, and the Motions to Suppress are denied.

IT IS SO ORDERED.

DATE: November 7, 2011

/s/ Ortrie D. Smith
ORTRIE D. SMITH, SENIOR JUDGE
UNITED STATES DISTRICT COURT

---

[2]The Court's conclusion that the photo lineup was not impermissibly suggestive makes it unnecessary to consider whether the identification was reliable. For what it's worth, the Court believes the lineup was sufficiently reliable that it can be used as evidence at trial. Defendant is free to argue at trial that Ms. Herdler was mistaken.